(Slip Opinion) OCTOBER TERM, 2020 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## NATIONAL COLLEGIATE ATHLETIC ASSOCIATION *v.* ALSTON ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 20–512. Argued March 31, 2021—Decided June 21, 2021*

Colleges and universities across the country have leveraged sports to bring in revenue, attract attention, boost enrollment, and raise money from alumni. That profitable enterprise relies on "amateur" student-athletes who compete under horizontal restraints that restrict how the schools may compensate them for their play. The National Collegiate Athletic Association (NCAA) issues and enforces these rules, which restrict compensation for student-athletes in various ways. These rules depress compensation for at least some student-athletes below what a competitive market would yield.

Against this backdrop, current and former student-athletes brought this antitrust lawsuit challenging the NCAA's restrictions on compensation. Specifically, they alleged that the NCAA's rules violate §1 of the Sherman Act, which prohibits "contract[s], combination[s], or conspirac[ies] in restraint of trade or commerce." 15 U. S. C. §1. Key facts were undisputed: The NCAA and its members have agreed to compensation limits for student-athletes; the NCAA enforces these limits on its member-schools; and these compensation limits affect interstate commerce. Following a bench trial, the district court issued a 50-page opinion that refused to disturb the NCAA's rules limiting undergraduate athletic scholarships and other compensation related to athletic performance. At the same time, the court found unlawful and thus enjoined certain NCAA rules limiting the education-related benefits schools may make available to student-athletes. Both sides appealed. The Ninth Circuit affirmed in full, holding that the district court

——————
*Together with No. 20–520, *American Athletic Conference et al.* v. *Alston et al.,* also on certiorari to the same court.

"struck the right balance in crafting a remedy that both prevents anti-competitive harm to Student-Athletes while serving the procompetitive purpose of preserving the popularity of college sports." 958 F. 3d 1239, 1263. Unsatisfied with that result, the NCAA asks the Court to find that all of its existing restraints on athlete compensation survive antitrust scrutiny. The student-athletes have not renewed their across-the-board challenge and the Court thus does not consider the rules that remain in place. The Court considers only the subset of NCAA rules restricting education-related benefits that the district court enjoined. The Court does so based on the uncontested premise that the NCAA enjoys monopsony control in the relevant market—such that it is capable of depressing wages below competitive levels for student-athletes and thereby restricting the quantity of student-athlete labor.

*Held*: The district court's injunction is consistent with established antitrust principles. Pp. 15–36.

(a) The courts below properly subjected the NCAA's compensation restrictions to antitrust scrutiny under a "rule of reason" analysis. In the Sherman Act, Congress tasked courts with enforcing an antitrust policy of competition on the theory that market forces "yield the best allocation" of the Nation's resources. *National Collegiate Athletic Assn.* v. *Board of Regents of Univ. of Okla.*, 468 U. S. 85, 104, n. 27. The Sherman Act's prohibition on restraints of trade has long been understood to prohibit only restraints that are "undue." *Ohio* v. *American Express Co.*, 585 U. S. ___, ___. Whether a particular restraint is undue "presumptively" turns on an application of a "rule of reason analysis." *Texaco, Inc.* v. *Dagher*, 547 U. S. 1, 5. That manner of analysis generally requires a court to "conduct a fact-specific assessment of market power and market structure" to assess a challenged restraint's "actual effect on competition." *American Express*, 585 U. S., at ___. Pp. 15–24.

(1) The NCAA maintains the courts below should have analyzed its compensation restrictions under an extremely deferential standard because it is a joint venture among members who must collaborate to offer consumers the unique product of intercollegiate athletic competition. Even assuming the NCAA is a joint venture, though, it is a joint venture with monopoly power in the relevant market. Its restraints are appropriately subject to the ordinary rule of reason's fact-specific assessment of their effect on competition. *American Express*, 585 U. S., at ___. Circumstances sometimes allow a court to determine the anticompetitive effects of a challenged restraint (or lack thereof) under an abbreviated or "quick look." See *Dagher*, 547 U. S., at 7, n. 3; *Board of Regents*, 468 U. S., at 109, n. 39. But not here. Pp. 15–19.

(2) The NCAA next contends that the Court's decision in *Board of*

*Regents* expressly approved the NCAA's limits on student-athlete compensation. That is incorrect. The Court in *Board of Regents* did not analyze the lawfulness of the NCAA's restrictions on student-athlete compensation. Rather, that case involved an antitrust challenge to the NCAA's restraints on televising games—an antitrust challenge the Court sustained. Along the way, the Court commented on the NCAA's critical role in maintaining the revered tradition of amateurism in college sports as one "entirely consistent with the goals of the Sherman Act." *Id.*, at 120. But that sort of passing comment on an issue not presented is not binding, nor is it dispositive here. Pp. 19–21.

(3) The NCAA also submits that a rule of reason analysis is inappropriate because its member schools are not "commercial enterprises" but rather institutions that exist to further the societally important noncommercial objective of undergraduate education. This submission also fails. The Court has regularly refused these sorts of special dispensations from the Sherman Act. See *FTC* v. *Superior Court Trial Lawyers Assn.*, 493 U. S. 411, 424. The Court has also previously subjected the NCAA to the Sherman Act, and any argument that "the special characteristics of [the NCAA's] particular industry" should exempt it from the usual operation of the antitrust laws is "properly addressed to Congress." *National Soc. of Professional Engineers* v. *United States*, 435 U. S. 679, 689. Pp. 21–24.

(b) The NCAA's remaining attacks on the district court's decision lack merit. Pp. 24–36.

(1) The NCAA contends that the district court erroneously required it to prove that its rules are the least restrictive means of achieving the procompetitive purpose of preserving consumer demand for college sports. True, a least restrictive means test would be erroneous and overly intrusive. But the district court nowhere expressly or effectively required the NCAA to show that its rules met that standard. Rather, only after finding the NCAA's restraints "patently and inexplicably stricter than is necessary" did the district court find the restraints unlawful. Pp. 24–29.

(2) The NCAA contends the district court should have deferred to its conception of amateurism instead of "impermissibly redefin[ing]" its "product." But a party cannot declare a restraint "immune from § 1 scrutiny" by relabeling it a product feature. *American Needle, Inc.* v. *National Football League*, 560 U. S. 183, 199, n. 7. Moreover, the district court found the NCAA had not even maintained a consistent definition of amateurism. Pp. 29–30.

(3) The NCAA disagrees that it can achieve the same pro-competitive benefits using substantially less restrictive alternatives and claims the district court's injunction will "micromanage" its business. Judges must indeed be sensitive to the possibility that the "continuing

Syllabus

supervision of a highly detailed decree" could wind up impairing rather than enhancing competition. *Verizon Communications Inc.* v. *Law Offices of Curtis V. Trinko, LLP*, 540 U. S. 398, 415. The district court's injunction honored these principles, though. The court enjoined only certain restraints—and only after finding both that relaxing these restrictions would not blur the distinction between college and professional sports and thus impair demand, and further that this course represented a significantly (not marginally) less restrictive means of achieving the same procompetitive benefits as the NCAA's current rules. Finally, the court's injunction preserves considerable leeway for the NCAA, while individual conferences remain free to impose whatever rules they choose. To the extent the NCAA believes meaningful ambiguity exists about the scope of its authority, it may seek clarification from the district court. Pp. 30–36.

958 F. 3d 1239, affirmed.

GORSUCH, J., delivered the opinion for a unanimous Court. KAVANAUGH, J., filed a concurring opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports.  Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———————

Nos. 20–512 and 20–520

———————

## NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, PETITIONER
20–512                    *v.*
SHAWNE ALSTON, ET AL.


## AMERICAN ATHLETIC CONFERENCE, ET AL., PETITIONERS
20–520                    *v.*
SHAWNE ALSTON, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 21, 2021]

JUSTICE GORSUCH delivered the opinion of the Court.

In the Sherman Act, Congress tasked courts with enforcing a policy of competition on the belief that market forces "yield the best allocation" of the Nation's resources.  *National Collegiate Athletic Assn.* v. *Board of Regents of Univ. of Okla.*, 468 U. S. 85, 104, n. 27 (1984).  The plaintiffs before us brought this lawsuit alleging that the National Collegiate Athletic Association (NCAA) and certain of its member institutions violated this policy by agreeing to restrict the compensation colleges and universities may offer the student-athletes who play for their teams.  After amassing a vast record and conducting an exhaustive trial, the district court issued a 50-page opinion that cut both ways.  The

court refused to disturb the NCAA's rules limiting under-graduate athletic scholarships and other compensation related to athletic performance. At the same time, the court struck down NCAA rules limiting the education-related benefits schools may offer student-athletes—such as rules that prohibit schools from offering graduate or vocational school scholarships. Before us, the student-athletes do not challenge the district court's judgment. But the NCAA does. In essence, it seeks immunity from the normal operation of the antitrust laws and argues, in any event, that the district court should have approved all of its existing restraints. We took this case to consider those objections.

## I

### A

From the start, American colleges and universities have had a complicated relationship with sports and money. In 1852, students from Harvard and Yale participated in what many regard as the Nation's first intercollegiate competition—a boat race at Lake Winnipesaukee, New Hampshire. But this was no pickup match. A railroad executive sponsored the event to promote train travel to the picturesque lake. T. Mendenhall, The Harvard-Yale Boat Race 1852–1924, pp. 15–16 (1993). He offered the competitors an all-expenses-paid vacation with lavish prizes—along with unlimited alcohol. See A. Zimbalist, Unpaid Professionals 6–7 (1999) (Zimbalist); Rushin, Inside the Moat, Sports Illustrated, Mar. 3, 1997. The event filled the resort with "life and excitement," N. Y. Herald, Aug. 10, 1852, p. 2, col. 2, and one student-athlete described the "'junket'" as an experience "'as unique and irreproducible as the Rhodian colossus,'" Mendenhall, Harvard-Yale Boat Race, at 20.

Life might be no "less than a boat race," Holmes, On Receiving the Degree of Doctor of Laws, Yale University Commencement, June 30, 1886, in Speeches by Oliver Wendall Holmes, p. 27 (1918), but it was football that really caused

college sports to take off. "By the late 1880s the traditional rivalry between Princeton and Yale was attracting 40,000 spectators and generating in excess of $25,000 . . . in gate revenues." Zimbalist 7. Schools regularly had "graduate students and paid ringers" on their teams. *Ibid.*

Colleges offered all manner of compensation to talented athletes. Yale reportedly lured a tackle named James Hogan with free meals and tuition, a trip to Cuba, the exclusive right to sell scorecards from his games—and a job as a cigarette agent for the American Tobacco Company. *Ibid.*; see also Needham, The College Athlete, McClure's Magazine, June 1905, p. 124. The absence of academic residency requirements gave rise to "'tramp athletes'" who "roamed the country making cameo athletic appearances, moving on whenever and wherever the money was better." F. Dealy, Win at Any Cost 71 (1990). One famous example was a law student at West Virginia University—Fielding H. Yost— "who, in 1896, transferred to Lafayette as a freshman just in time to lead his new teammates to victory against its arch-rival, Penn." *Ibid.* The next week, he "was back at West Virginia's law school." *Ibid.* College sports became such a big business that Woodrow Wilson, then President of Princeton University, quipped to alumni in 1890 that "'Princeton is noted in this wide world for three things: football, baseball, and collegiate instruction.'" Zimbalist 7.

By 1905, though, a crisis emerged. While college football was hugely popular, it was extremely violent. Plays like the flying wedge and the players' light protective gear led to 7 football fatalities in 1893, 12 deaths the next year, and 18 in 1905. *Id.*, at 8. President Theodore Roosevelt responded by convening a meeting between Harvard, Princeton, and Yale to review the rules of the game, a gathering that ultimately led to the creation of what we now know as the NCAA. *Ibid.* Organized primarily as a standard-setting body, the association also expressed a view at its founding about compensating college athletes—admonishing that

"[n]o student shall represent a College or University in any intercollegiate game or contest who is paid or receives, directly or indirectly, any money, or financial concession." Intercollegiate Athletic Association of the United States Constitution By-Laws, Art. VII, §3 (1906); see also Proceedings of the Eleventh Annual Convention of the National Collegiate Athletic Association, Dec. 28, 1916, p. 34.

Reality did not always match aspiration. More than two decades later, the Carnegie Foundation produced a report on college athletics that found them still "sodden with the commercial and the material and the vested interests that these forces have created." H. Savage, The Carnegie Foundation for the Advancement of Teaching, American College Athletics Bull. 23, p. 310 (1929). Schools across the country sought to leverage sports to bring in revenue, attract attention, boost enrollment, and raise money from alumni. The University of California's athletic revenue was over $480,000, while Harvard's football revenue alone came in at $429,000. *Id.*, at 87. College football was "not a student's game"; it was an "organized commercial enterprise" featuring athletes with "years of training," "professional coaches," and competitions that were "highly profitable." *Id.*, at viii.

The commercialism extended to the market for student-athletes. Seeking the best players, many schools actively participated in a system "under which boys are offered pecuniary and other inducements to enter a particular college." *Id.*, at xiv–xv. One coach estimated that a rival team "spent over $200,000 a year on players." Zimbalist 9. In 1939, freshmen at the University of Pittsburgh went on strike because upperclassmen were reportedly earning more money. Crabb, The Amateurism Myth: A Case for a New Tradition, 28 Stan. L. & Pol'y Rev. 181, 190 (2017). In the 1940s, Hugh McElhenny, a halfback at the University of Washington, "became known as the first college player 'ever to take a cut in salary to play pro football.'" Zimbalist 22–23. He reportedly said: "'[A] wealthy guy puts big

bucks under my pillow every time I score a touchdown. Hell, I can't afford to graduate.'" *Id.,* at 211, n. 17. In 1946, a commentator offered this view: "[W]hen it comes to chicanery, double-dealing, and general undercover work behind the scenes, big-time college football is in a class by itself." Woodward, Is College Football on the Level?, Sport, Nov. 1946, Vol. 1, No. 3, p. 35.

In 1948, the NCAA sought to do more than admonish. It adopted the "Sanity Code." Colleges Adopt the 'Sanity Code' To Govern Sports, N. Y. Times, Jan. 11, 1948, p. 1, col. 1. The code reiterated the NCAA's opposition to "promised pay in any form." Hearings before the Subcommittee on Oversight and Investigations of the House Committee on Interstate and Foreign Commerce, 95th Congress, 2d Sess., pt. 2, p. 1094 (1978). But for the first time the code also authorized colleges and universities to pay athletes' tuition. *Ibid.* And it created a new enforcement mechanism— providing for the "suspension or expulsion" of "proven offenders." Colleges Adopt 'Sanity Code,' N. Y. Times, p. 1, col. 1. To some, these changes sought to substitute a consistent, above-board compensation system for the varying under-the-table schemes that had long proliferated. To others, the code marked "the beginning of the NCAA behaving as an effective cartel," by enabling its member schools to set and enforce "rules that limit the price they have to pay for their inputs (mainly the 'student-athletes')." Zimbalist 10.

The rules regarding student-athlete compensation have evolved ever since. In 1956, the NCAA expanded the scope of allowable payments to include room, board, books, fees, and "cash for incidental expenses such as laundry." *In re National Collegiate Athletic Assn. Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1063 (ND Cal. 2019) (hereinafter D. Ct. Op.). In 1974, the NCAA began permitting paid professionals in one sport to compete on an amateur basis in another. Brief for Historians as *Amici Cu-*

*riae* 10.  In 2014, the NCAA "announced it would allow ath-letic conferences to authorize their member schools to in-crease scholarships up to the full cost of attendance." *O'Bannon* v. *National Collegiate Athletic Assn.*, 802 F. 3d 1049, 1054–1055 (CA9 2015).  The 80 member schools of the "Power Five" athletic conferences—the conferences with the highest revenue in Division I—promptly voted to raise their scholarship limits to an amount that is generally sev-eral thousand dollars higher than previous limits.  D. Ct. Op., at 1064.

In recent years, changes have continued.  The NCAA has created the "Student Assistance Fund" and the "Academic Enhancement Fund" to "assist student-athletes in meeting financial needs," "improve their welfare or academic sup-port," or "recognize academic achievement."  *Id.*, at 1072. These funds have supplied money to student-athletes for "postgraduate scholarships" and "school supplies," as well as "benefits that are not related to education," such as "loss-of-value insurance premiums," "travel expenses," "cloth-ing," and "magazine subscriptions."  *Id.*, at 1072, n. 15.  In 2018, the NCAA made more than \$84 million available through the Student Activities Fund and more than \$48 million available through the Academic Enhancement Fund.  *Id.*, at 1072.  Assistance may be provided in cash or in kind, and there is no limit to the amount any particular student-athlete may receive.  *Id.*, at 1073.  Since 2015, dis-bursements to individual students have sometimes been tens of thousands of dollars above the full cost of attend-ance.  *Ibid.*

The NCAA has also allowed payments "'incidental to ath-letics participation,'" including awards for "participation or achievement in athletics" (like "qualifying for a bowl game") and certain "payments from outside entities" (such as for "performance in the Olympics").  *Id.,* at 1064, 1071, 1074. The NCAA permits its member schools to award up to (but no more than) two annual "Senior Scholar Awards" of

$10,000 for students to attend graduate school after their athletic eligibility expires. *Id.*, at 1074. Finally, the NCAA allows schools to fund travel for student-athletes' family members to attend "certain events." *Id.*, at 1069.

Over the decades, the NCAA has become a sprawling enterprise. Its membership comprises about 1,100 colleges and universities, organized into three divisions. *Id.*, at 1063. Division I teams are often the most popular and attract the most money and the most talented athletes. Currently, Division I includes roughly 350 schools divided across 32 conferences. See *ibid.* Within Division I, the most popular sports are basketball and football. The NCAA divides Division I football into the Football Bowl Subdivision (FBS) and the Football Championship Subdivision, with the FBS generally featuring the best teams. *Ibid.* The 32 conferences in Division I function similarly to the NCAA itself, but on a smaller scale. They "can and do enact their own rules." *Id.,* at 1090.

At the center of this thicket of associations and rules sits a massive business. The NCAA's current broadcast contract for the March Madness basketball tournament is worth $1.1 billion annually. See *id.,* at 1077, n. 20. Its television deal for the FBS conference's College Football Playoff is worth approximately $470 million per year. See *id.*, at 1063; Bachman, ESPN Strikes Deal for College Football Playoff, Wall Street Journal, Nov. 21, 2012. Beyond these sums, the Division I conferences earn substantial revenue from regular-season games. For example, the Southeastern Conference (SEC) "made more than $409 million in revenues from television contracts alone in 2017, with its total conference revenues exceeding $650 million that year." D. Ct. Op., at 1063. All these amounts have "increased consistently over the years." *Ibid.*

Those who run this enterprise profit in a different way than the student-athletes whose activities they oversee. The president of the NCAA earns nearly $4 million per

year.  Brief for Players Association of the National Football League et al. as *Amici Curiae* 17.  Commissioners of the top conferences take home between $2 to $5 million.  *Ibid.*  College athletic directors average more than $1 million annually.  *Ibid.*  And annual salaries for top Division I college football coaches approach $11 million, with some of their assistants making more than $2.5 million.  *Id.*, at 17–18.

B

The plaintiffs are current and former student-athletes in men's Division I FBS football and men's and women's Division I basketball.  They filed a class action against the NCAA and 11 Division I conferences (for simplicity's sake, we refer to the defendants collectively as the NCAA).  The student-athletes challenged the "current, interconnected set of NCAA rules that limit the compensation they may receive in exchange for their athletic services."  D. Ct. Op., at 1062, 1065, n. 5.  Specifically, they alleged that the NCAA's rules violate §1 of the Sherman Act, which prohibits "contract[s], combination[s], or conspirac[ies] in restraint of trade or commerce."  15 U. S. C. §1.

After pretrial proceedings stretching years, the district court conducted a 10-day bench trial.  It heard experts and lay witnesses from both sides, and received volumes of evidence and briefing, all before issuing an exhaustive decision.  In the end, the court found the evidence undisputed on certain points.  The NCAA did not "contest evidence showing" that it and its members have agreed to compensation limits on student-athletes;  the NCAA and its conferences enforce these limits by punishing violations;  and these limits "affect interstate commerce."  D. Ct. Op., at 1066.

Based on these premises, the district court proceeded to assess the lawfulness of the NCAA's challenged restraints.  This Court has "long recognized that in view of the common law and the law in this country when the Sherman Act was

passed, the phrase 'restraint of trade' is best read to mean 'undue restraint.'" *Ohio* v. *American Express Co.*, 585 U. S. \_\_\_, \_\_\_ (2018) (slip op., at 8) (brackets and some internal quotation marks omitted). Determining whether a restraint is undue for purposes of the Sherman Act "presumptively" calls for what we have described as a "rule of reason analysis." *Texaco Inc.* v. *Dagher*, 547 U. S. 1, 5 (2006); *Standard Oil Co. of N. J.* v. *United States*, 221 U. S. 1, 60–62 (1911). That manner of analysis generally requires a court to "conduct a fact-specific assessment of market power and market structure" to assess a challenged restraint's "actual effect on competition." *American Express*, 585 U. S., at \_\_\_–\_\_\_ (slip op., at 8–9) (internal quotation marks omitted). Always, "[t]he goal is to distinguish between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." *Ibid.* (brackets and internal quotation marks omitted).

In applying the rule of reason, the district court began by observing that the NCAA enjoys "near complete dominance of, and exercise[s] monopsony power in, the relevant market"—which it defined as the market for "athletic services in men's and women's Division I basketball and FBS football, wherein each class member participates in his or her sport-specific market." D. Ct. Op., at 1097. The "most talented athletes are concentrated" in the "markets for Division I basketball and FBS football." *Id.*, at 1067. There are no "viable substitutes," as the "NCAA's Division I essentially *is* the relevant market for elite college football and basketball." *Id.*, at 1067, 1070. In short, the NCAA and its member schools have the "power to restrain student-athlete compensation in any way and at any time they wish, without any meaningful risk of diminishing their market dominance." *Id.*, at 1070.

The district court then proceeded to find that the NCAA's compensation limits "produce significant anticompetitive

effects in the relevant market." *Id.*, at 1067. Though member schools compete fiercely in recruiting student-athletes, the NCAA uses its monopsony power to "cap artificially the compensation offered to recruits." *Id.*, at 1097. In a market without the challenged restraints, the district court found, "competition among schools would increase in terms of the compensation they would offer to recruits, and student-athlete compensation would be higher as a result." *Id.*, at 1068. "Student-athletes would receive offers that would more closely match the value of their athletic services." *Ibid.* And notably, the court observed, the NCAA "did not meaningfully dispute" any of this evidence. *Id.*, at 1067; see also Tr. of Oral Arg. 31 ("[T]here's no dispute that the—the no-pay-for-play rule imposes a significant restraint on a relevant antitrust market").

The district court next considered the NCAA's procompetitive justifications for its restraints. The NCAA suggested that its restrictions help increase output in college sports and maintain a competitive balance among teams. But the district court rejected those justifications, D. Ct. Op., at 1070, n. 12, and the NCAA does not pursue them here. The NCAA's only remaining defense was that its rules preserve amateurism, which in turn widens consumer choice by providing a unique product—amateur college sports as distinct from professional sports. Admittedly, this asserted benefit accrues to consumers in the NCAA's seller-side consumer market rather than to student-athletes whose compensation the NCAA fixes in its buyer-side labor market. But, the NCAA argued, the district court needed to assess its restraints in the labor market in light of their procompetitive benefits in the consumer market—and the district court agreed to do so. *Id.*, at 1098.

Turning to that task, the court observed that the NCAA's conception of amateurism has changed steadily over the years. See *id.*, at 1063–1064, 1072–1073; see also *supra,* at 3–7. The court noted that the NCAA "nowhere define[s] the

nature of the amateurism they claim consumers insist upon." D. Ct. Op., at 1070. And, given all this, the court struggled to ascertain for itself "any coherent definition" of the term, *id.*, at 1074, noting the testimony of a former SEC commissioner that he's "'never been clear on . . . what is really meant by amateurism.'" *Id.*, at 1070–1071.

Nor did the district court find much evidence to support the NCAA's contention that its compensation restrictions play a role in consumer demand. As the court put it, the evidence failed "to establish that the challenged compensation rules, in and of themselves, have any direct connection to consumer demand." *Id.*, at 1070. The court observed, for example, that the NCAA's "only economics expert on the issue of consumer demand" did not "study any standard measures of consumer demand" but instead simply "interviewed people connected with the NCAA and its schools, who were chosen for him by defense counsel." *Id.*, at 1075. Meanwhile, the student-athletes presented expert testimony and other evidence showing that consumer demand has increased markedly despite the new types of compensation the NCAA has allowed in recent decades. *Id.*, at 1074, 1076. The plaintiffs presented economic and other evidence suggesting as well that further increases in student-athlete compensation would "not negatively affect consumer demand." *Id.*, at 1076. At the same time, however, the district court did find that one particular aspect of the NCAA's compensation limits "may have some effect in preserving consumer demand." *Id.,* at 1082. Specifically, the court found that rules aimed at ensuring "student-athletes do not receive unlimited payments unrelated to education" could play some role in product differentiation with professional sports and thus help sustain consumer demand for college athletics. *Id.*, at 1083.

The court next required the student-athletes to show that "substantially less restrictive alternative rules" existed that "would achieve the same procompetitive effect as the

challenged set of rules." *Id.*, at 1104. The district court emphasized that the NCAA must have "ample latitude" to run its enterprise and that courts "may not use antitrust laws to make marginal adjustments to broadly reasonable market restraints." *Ibid.* (internal quotation marks omitted). In light of these standards, the court found the student-athletes had met their burden in some respects but not others. The court rejected the student-athletes' challenge to NCAA rules that limit athletic scholarships to the full cost of attendance and that restrict compensation and benefits unrelated to education. These may be price-fixing agreements, but the court found them to be reasonable in light of the possibility that "professional-level cash payments . . . could blur the distinction between college sports and professional sports and thereby negatively affect consumer demand." *Ibid.*

The court reached a different conclusion for caps on education-related benefits—such as rules that limit scholarships for graduate or vocational school, payments for academic tutoring, or paid posteligibility internships. *Id.*, at 1088. On no account, the court found, could such education-related benefits be "confused with a professional athlete's salary." *Id.*, at 1083. If anything, they "emphasize that the recipients are students." *Ibid.* Enjoining the NCAA's restrictions on these forms of compensation alone, the court concluded, would be substantially less restrictive than the NCAA's current rules and yet fully capable of preserving consumer demand for college sports. *Id.*, at 1088.

The court then entered an injunction reflecting its findings and conclusions. Nothing in the order precluded the NCAA from continuing to fix compensation and benefits unrelated to education; limits on athletic scholarships, for example, remained untouched. The court enjoined the NCAA only from limiting education-related compensation or benefits that conferences and schools may provide to student-athletes playing Division I football and basketball. App. to

Pet. for Cert. in No. 20–512, p. 167a, ¶1. The court's injunction further specified that the NCAA could continue to limit cash awards for academic achievement—but only so long as those limits are no lower than the cash awards allowed for athletic achievement (currently $5,980 annually). *Id.,* at 168a–169a, ¶5; Order Granting Motion for Clarification of Injunction in No. 4:14–md–02541, ECF Doc. 1329, pp. 5–6 (ND Cal., Dec. 30, 2020). The court added that the NCAA and its members were free to propose a definition of compensation or benefits "'related to education.'" App. to Pet. for Cert. in No. 20–512, at 168a, ¶4. And the court explained that the NCAA was free to regulate how conferences and schools provide education-related compensation and benefits. *Ibid.* The court further emphasized that its injunction applied only to the NCAA and multi-conference agreements—thus allowing individual conferences (and the schools that constitute them) to impose tighter restrictions if they wish. *Id.*, at 169a, ¶6. The district court's injunction issued in March 2019, and took effect in August 2020.

Both sides appealed. The student-athletes said the district court did not go far enough; it should have enjoined all of the NCAA's challenged compensation limits, including those "untethered to education," like its restrictions on the size of athletic scholarships and cash awards. *In re National Collegiate Athletic Assn. Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F. 3d 1239, 1263 (CA9 2020). The NCAA, meanwhile, argued that the district court went too far by weakening its restraints on education-related compensation and benefits. In the end, the court of appeals affirmed in full, explaining its view that "the district court struck the right balance in crafting a remedy that both prevents anticompetitive harm to Student-Athletes while serving the procompetitive purpose of preserving the popularity of college sports." *Ibid.*

## C

Unsatisfied with this result, the NCAA asks us to reverse to the extent the lower courts sided with the student-athletes. For their part, the student-athletes do not renew their across-the-board challenge to the NCAA's compensation restrictions. Accordingly, we do not pass on the rules that remain in place or the district court's judgment upholding them. Our review is confined to those restrictions now enjoined.

Before us, as through much of the litigation below, some of the issues most frequently debated in antitrust litigation are uncontested. The parties do not challenge the district court's definition of the relevant market. They do not contest that the NCAA enjoys monopoly (or, as it's called on the buyer side, monopsony) control in that labor market—such that it is capable of depressing wages below competitive levels and restricting the quantity of student-athlete labor. Nor does the NCAA dispute that its member schools compete fiercely for student-athletes but remain subject to NCAA-issued-and-enforced limits on what compensation they can offer. Put simply, this suit involves admitted horizontal price fixing in a market where the defendants exercise monopoly control.

Other significant matters are taken as given here too. No one disputes that the NCAA's restrictions *in fact* decrease the compensation that student-athletes receive compared to what a competitive market would yield. No one questions either that decreases in compensation also depress participation by student-athletes in the relevant labor market—so that price and quantity are both suppressed. See 12 P. Areeda & H. Hovenkamp, Antitrust Law ¶2011b, p. 134 (4th ed. 2019) (Areeda & Hovenkamp). Nor does the NCAA suggest that, to prevail, the plaintiff student-athletes must show that its restraints harm competition in the seller-side (or consumer facing) market as well as in its buyer-side (or labor) market. See, *e.g., Mandeville Island Farms, Inc.* v.

*American Crystal Sugar Co.*, 334 U. S. 219, 235 (1948); *Weyerhaeuser Co.* v. *Ross-Simmons Hardwood Lumber Co.*, 549 U. S. 312, 321 (2007); 2A Areeda & Hovenkamp ¶352c, pp. 288–289 (2014); 12 *id.*, ¶2011a, at 132–134.

Meanwhile, the student-athletes do not question that the NCAA may permissibly seek to justify its restraints in the labor market by pointing to procompetitive effects they produce in the consumer market. Some *amici* argue that "competition in input markets is incommensurable with competition in output markets," and that a court should not "trade off" sacrificing a legally cognizable interest in competition in one market to better promote competition in a different one; review should instead be limited to the particular market in which antitrust plaintiffs have asserted their injury. Brief for American Antitrust Institute as *Amicus Curiae* 3, 11–12. But the parties before us do not pursue this line.

## II
## A

With all these matters taken as given, we express no views on them. Instead, we focus only on the objections the NCAA *does* raise. Principally, it suggests that the lower courts erred by subjecting its compensation restrictions to a rule of reason analysis. In the NCAA's view, the courts should have given its restrictions at most an "abbreviated deferential review," Brief for Petitioner in No. 20–512, p. 14, or a "'quick look,'" Brief for Petitioners in No. 20–520, p. 18, before approving them.

The NCAA offers a few reasons why. Perhaps dominantly, it argues that it is a joint venture and that collaboration among its members is necessary if they are to offer consumers the benefit of intercollegiate athletic competition. We doubt little of this. There's no question, for example, that many "joint ventures are calculated to enable firms to do something more cheaply or better than they did it before." 13 Areeda & Hovenkamp ¶2100c, at 7. And the fact

that joint ventures can have such procompetitive benefits surely stands as a caution against condemning their arrangements too reflexively. See *Dagher*, 547 U. S., at 7; *Broadcast Music, Inc.* v. *Columbia Broadcasting System, Inc.*, 441 U. S. 1, 22–23 (1979).

But even assuming (without deciding) that the NCAA is a joint venture, that does not guarantee the foreshortened review it seeks. Most restraints challenged under the Sherman Act—including most joint venture restrictions—are subject to the rule of reason, which (again) we have described as "a fact-specific assessment of market power and market structure" aimed at assessing the challenged restraint's "actual effect on competition"—especially its capacity to reduce output and increase price. *American Express*, 585 U. S., at ___–___ (slip op., at 8–9) (internal quotation marks omitted).

Admittedly, the amount of work needed to conduct a fair assessment of these questions can vary. As the NCAA observes, this Court has suggested that sometimes we can determine the competitive effects of a challenged restraint in the "'twinkling of an eye.'" *Board of Regents*, 468 U. S., at 110, n. 39 (quoting P. Areeda, The "Rule of Reason" in Antitrust Analysis: General Issues 37–38 (Federal Judicial Center, June 1981)); *American Needle, Inc.* v. *National Football League*, 560 U. S. 183, 203 (2010). That is true, though, only for restraints at opposite ends of the competitive spectrum. For those sorts of restraints—rather than restraints in the great in-between—a quick look is sufficient for approval or condemnation.

At one end of the spectrum, some restraints may be so obviously incapable of harming competition that they require little scrutiny. In *Rothery Storage & Van Co.* v. *Atlas Van Lines, Inc.*, 792 F. 2d 210 (CADC 1986), for example, Judge Bork explained that the analysis could begin and end with the observation that the joint venture under review "command[ed] between 5.1 and 6% of the relevant market."

*Id.*, at 217. Usually, joint ventures enjoying such small market share are incapable of impairing competition. Should they reduce their output, "there would be no effect upon market price because firms making up the other 94% of the market would simply take over the abandoned business." *Ibid.*; see also 7 Areeda & Hovenkamp ¶1507a, p. 444 (2017) (If "the exercise of market power is not plausible, the challenged practice is legal"); *Polk Bros., Inc.* v. *Forest City Enterprises, Inc.*, 776 F. 2d 185, 191 (CA7 1985) ("Unless the firms have the power to raise price by curtailing output, their agreement is unlikely to harm consumers, and it makes sense to understand their cooperation as benign or beneficial").

At the other end, some agreements among competitors so obviously threaten to reduce output and raise prices that they might be condemned as unlawful *per se* or rejected after only a quick look. See *Dagher*, 547 U. S., at 7, n. 3; *California Dental Assn.* v. *FTC*, 526 U. S. 756, 770 (1999). Recognizing the inherent limits on a court's ability to master an entire industry—and aware that there are often hard-to-see efficiencies attendant to complex business arrangements—we take special care not to deploy these condemnatory tools until we have amassed "considerable experience with the type of restraint at issue" and "can predict with confidence that it would be invalidated in all or almost all instances." *Leegin Creative Leather Products, Inc.* v. *PSKS, Inc.*, 551 U. S. 877, 886–887 (2007); Easterbrook, On Identifying Exclusionary Conduct, 61 Notre Dame L. Rev. 972, 975 (1986) (noting that it can take "economists years, sometimes decades, to understand why certain business practices work [and] determine whether they work because of increased efficiency or exclusion"); see also *infra*, at 26–27 (further reasons for caution).

None of this helps the NCAA. The NCAA *accepts* that its members collectively enjoy monopsony power in the market for student-athlete services, such that its restraints can

(and in fact do) harm competition. See D. Ct. Op., at 1067. Unlike customers who would look elsewhere when a small van company raises its prices above market levels, the district court found (and the NCAA does not here contest) that student-athletes have nowhere else to sell their labor. Even if the NCAA is a joint venture, then, it is hardly of the sort that would warrant quick-look approval for all its myriad rules and restrictions.

Nor does the NCAA's status as a particular type of venture categorically exempt its restraints from ordinary rule of reason review. We do not doubt that some degree of coordination between competitors within sports leagues can be procompetitive. Without some agreement among rivals—on things like how many players may be on the field or the time allotted for play—the very competitions that consumers value would not be possible. See *Board of Regents*, 468 U. S., at 101 (quoting R. Bork, The Antitrust Paradox 278 (1978)). Accordingly, even a sports league with market power might see some agreements among its members win antitrust approval in the "'twinkling of an eye.'" *American Needle*, 560 U. S., at 203.

But this insight does not always apply. That *some* restraints are necessary to create or maintain a league sport does not mean *all* "aspects of elaborate interleague cooperation are." *Id.*, at 199, n. 7. While a quick look will often be enough to approve the restraints "necessary to produce a game," *ibid.*, a fuller review may be appropriate for others. See, *e.g., Chicago Professional Sports Ltd. Partnership* v. *National Basketball Assn.*, 95 F. 3d 593, 600 (CA7 1996) ("Just as the ability of McDonald's franchises to coordinate the release of a new hamburger does not imply their ability to agree on wages for counter workers, so the ability of sports teams to agree on a TV contract need not imply an ability to set wages for players").

The NCAA's rules fixing wages for student-athletes fall on the far side of this line. Nobody questions that Division

I basketball and FBS football can proceed (and have proceeded) without the education-related compensation restrictions the district court enjoined; the games go on. Instead, the parties dispute whether and to what extent those restrictions in the NCAA's labor market yield benefits in its consumer market that can be attained using substantially less restrictive means. That dispute presents complex questions requiring more than a blink to answer.

## B

Even if background antitrust principles counsel in favor of the rule of reason, the NCAA replies that a particular precedent ties our hands. The NCAA directs our attention to *Board of Regents*, where this Court considered the league's rules restricting the ability of its member schools to televise football games. 468 U. S., at 94. On the NCAA's reading, that decision expressly approved its limits on student-athlete compensation—and this approval forecloses any meaningful review of those limits today.

We see things differently. *Board of Regents* explained that the league's television rules amounted to "[h]orizontal price fixing and output limitation[s]" of the sort that are "ordinarily condemned" as "'illegal *per se*.'" *Id.*, at 100. The Court declined to declare the NCAA's restraints *per se* unlawful only because they arose in "an industry" in which some "horizontal restraints on competition are essential if the product is to be available at all." *Id.*, at 101–102. Our analysis today is fully consistent with all of this. Indeed, if any daylight exists it is only in the NCAA's favor. While *Board of Regents* did not condemn the NCAA's broadcasting restraints as *per se* unlawful, it invoked abbreviated antitrust review as a path to condemnation, not salvation. *Id.*, at 109, n. 39. If a quick look was thought sufficient before rejecting the NCAA's procompetitive rationales in that case, it is hard to see how the NCAA might object to a court providing a more cautious form of review before reaching a

similar judgment here.

To be sure, the NCAA isn't without a reply. It notes that, in the course of reaching its judgment about television marketing restrictions, the *Board of Regents* Court commented on student-athlete compensation restrictions. Most particularly, the NCAA highlights this passage:

> "The NCAA plays a critical role in the maintenance of a revered tradition of amateurism in college sports. There can be no question but that it needs ample latitude to play that role, or that the preservation of the student-athlete in higher education adds richness and diversity to intercollegiate athletics and is entirely consistent with the goals of the Sherman Act." *Id.*, at 120.

See also *id.*, at 101, 102 (the NCAA "seeks to market a particular brand of football" in which "athletes must not be paid, must be required to attend class, and the like"). On the NCAA's telling, these observations foreclose any rule of reason review in this suit.

Once more, we cannot agree. *Board of Regents* may suggest that courts should take care when assessing the NCAA's restraints on student-athlete compensation, sensitive to their procompetitive possibilities. But these remarks do not suggest that courts must reflexively reject *all* challenges to the NCAA's compensation restrictions. Student-athlete compensation rules were not even at issue in *Board of Regents*. And the Court made clear it was only assuming the reasonableness of the NCAA's restrictions: "It is reasonable to *assume* that most of the regulatory controls of the NCAA are justifiable means of fostering competition among amateur athletic teams and are therefore procompetitive . . . ." *Id.*, at 117 (emphasis added). Accordingly, the Court simply did not have occasion to declare—nor did it declare—the NCAA's compensation restrictions procompetitive both in 1984 and forevermore.

Our confidence on this score is fortified by still another

factor. Whether an antitrust violation exists necessarily depends on a careful analysis of market realities. See, *e.g., American Express Co.*, 585 U. S., at \_\_\_–\_\_\_ (slip op., at 10–12); 2B Areeda & Hovenkamp ¶500, p. 107 (2014). If those market realities change, so may the legal analysis.

When it comes to college sports, there can be little doubt that the market realities have changed significantly since 1984. Since then, the NCAA has dramatically increased the amounts and kinds of benefits schools may provide to student-athletes. For example, it has allowed the conferences flexibility to set new and higher limits on athletic scholarships. D. Ct. Op., at 1064. It has increased the size of permissible benefits "incidental to athletics participation." *Id.*, at 1066. And it has developed the Student Assistance Fund and the Academic Enhancement Fund, which in 2018 alone provided over $100 million to student-athletes. *Id.*, at 1072. Nor is that all that has changed. In 1985, Division I football and basketball raised approximately $922 million and $41 million respectively. Brief for Former NCAA Executives as *Amici Curiae* 7. By 2016, NCAA Division I schools raised more than $13.5 billion. *Ibid.* From 1982 to 1984, CBS paid $16 million per year to televise the March Madness Division I men's basketball tournament. *Ibid.* In 2016, those annual television rights brought in closer to $1.1 billion. D. Ct. Op., at 1077, n. 20.

Given the sensitivity of antitrust analysis to market realities—and how much has changed in this market—we think it would be particularly unwise to treat an aside in *Board of Regents* as more than that. This Court may be "infallible only because we are final," *Brown* v. *Allen*, 344 U. S. 443, 540 (1953) (Jackson, J., concurring in result), but those sorts of stray comments are neither.

## C

The NCAA submits that a rule of reason analysis is inappropriate for still another reason—because the NCAA and

its member schools are not "commercial enterprises" and instead oversee intercollegiate athletics "as an integral part of the undergraduate experience." Brief for Petitioner in No. 20–512, at 31. The NCAA represents that it seeks to "maintain amateurism in college sports as part of serving [the] societally important non-commercial objective" of "higher education." *Id.*, at 3.

Here again, however, there may be less of a dispute than meets the eye. The NCAA does not contest that its restraints affect interstate trade and commerce and are thus subject to the Sherman Act. See D. Ct. Op., at 1066. The NCAA acknowledges that this Court already analyzed (and struck down) some of its restraints as anticompetitive in *Board of Regents.* And it admits, as it must, that the Court did all this only after observing that the Sherman Act had already been applied to other nonprofit organizations—and that "the economic significance of the NCAA's nonprofit character is questionable at best" given that "the NCAA and its member institutions are in fact organized to maximize revenues." 468 U. S., at 100–101, n. 22. Nor, on the other side of the equation, does anyone contest that the status of the NCAA's members as schools and the status of student-athletes as students may be relevant in assessing consumer demand as part of a rule of reason review.

With this much agreed it is unclear exactly what the NCAA seeks. To the extent it means to propose a sort of judicially ordained immunity from the terms of the Sherman Act for its restraints of trade—that we should overlook its restrictions because they happen to fall at the intersection of higher education, sports, and money—we cannot agree. This Court has regularly refused materially identical requests from litigants seeking special dispensation from the Sherman Act on the ground that their restraints of trade serve uniquely important social objectives beyond enhancing competition.

Take two examples. In *National Soc. of Professional Engineers* v. *United States*, 435 U. S. 679 (1978), a trade association argued that price competition between engineers competing for building projects had to be restrained to ensure quality work and protect public safety. *Id.*, at 679–680. This Court rejected that appeal as "nothing less than a frontal assault on the basic policy of the Sherman Act." *Id.*, at 695. The "statutory policy" of the Act is one of competition and it "precludes inquiry into the question whether competition is good or bad." *Ibid.* In *FTC* v. *Superior Court Trial Lawyers Assn.*, 493 U. S. 411 (1990), criminal defense lawyers agreed among themselves to refuse court appointments until the government increased their compensation. *Id.,* at 414. And once more the Court refused to consider whether this restraint of trade served some social good more important than competition: "The social justifications proffered for respondents' restraint of trade . . . do not make it any less unlawful." *Id.*, at 424.

To be sure, this Court once dallied with something that looks a bit like an antitrust exemption for professional baseball. In *Federal Baseball Club of Baltimore, Inc.* v. *National League of Professional Baseball Clubs*, 259 U. S. 200 (1922), the Court reasoned that "exhibitions" of "base ball" did not implicate the Sherman Act because they did not involve interstate trade or commerce—even though teams regularly crossed state lines (as they do today) to make money and enhance their commercial success. *Id.*, at 208–209. But this Court has refused to extend *Federal Baseball*'s reasoning to other sports leagues—and has even acknowledged criticisms of the decision as "'unrealistic'" and "'inconsistent'" and "aberration[al]." *Flood* v. *Kuhn*, 407 U. S. 258, 282 (1972) (quoting *Radovich* v. *National Football League*, 352 U. S. 445, 452 (1957)); see also Brief for Advocates for Minor Leaguers as *Amicus Curiae* 5, n. 3 (gathering criticisms). Indeed, as we have seen, this Court has already recognized that the NCAA itself *is* subject to the Sherman

Act.

The "orderly way" to temper that Act's policy of competition is "by legislation and not by court decision." *Flood*, 407 U. S., at 279. The NCAA is free to argue that, "because of the special characteristics of [its] particular industry," it should be exempt from the usual operation of the antitrust laws—but that appeal is "properly addressed to Congress." *National Soc. of Professional Engineers*, 435 U. S., at 689. Nor has Congress been insensitive to such requests. It has modified the antitrust laws for certain industries in the past, and it may do so again in the future. See, *e.g.*, 7 U. S. C. §§291–292 (agricultural cooperatives); 15 U. S. C. §§1011–1013 (insurance); 15 U. S. C. §§1801–1804 (newspaper joint operating agreements). But until Congress says otherwise, the only law it has asked us to enforce is the Sherman Act, and that law is predicated on one assumption alone—"competition is the best method of allocating resources" in the Nation's economy. *National Soc. of Professional Engineers*, 435 U. S., at 695.

### III

### A

While the NCAA devotes most of its energy to resisting the rule of reason in its usual form, the league lodges some objections to the district court's application of it as well.

When describing the rule of reason, this Court has sometimes spoken of "a three-step, burden-shifting framework" as a means for "'distinguish[ing] between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest.'" *American Express Co.*, 585 U. S., at ___ (slip op., at 9). As we have described it, "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect." *Ibid.* Should the plaintiff carry that burden, the burden then "shifts to the

defendant to show a procompetitive rationale for the re-
straint." *Ibid.* If the defendant can make that showing,
"the burden shifts back to the plaintiff to demonstrate that
the procompetitive efficiencies could be reasonably
achieved through less anticompetitive means." *Id.,* at \_\_\_–
\_\_\_ (slip op., at 9–10).

These three steps do not represent a rote checklist, nor
may they be employed as an inflexible substitute for careful
analysis. As we have seen, what is required to assess
whether a challenged restraint harms competition can vary
depending on the circumstances. See *supra*, at 15–19. The
whole point of the rule of reason is to furnish "an enquiry
meet for the case, looking to the circumstances, details, and
logic of a restraint" to ensure that it unduly harms compe-
tition before a court declares it unlawful. *California Dental*,
526 U. S., at 781; see also, *e.g., Leegin Creative*, 551 U. S.,
at 885 ("'[T]he factfinder weighs all of the circumstances of
a case in deciding whether a restrictive practice should be
prohibited as imposing an unreasonable restraint on com-
petition'"); *Copperweld Corp.* v. *Independence Tube Corp.*,
467 U. S. 752, 768 (1984); 7 Areeda & Hovenkamp ¶1507a,
at 442–444 (slightly different "decisional model" using se-
quential questions).

In the proceedings below, the district court followed cir-
cuit precedent to apply a multistep framework closely akin
to *American Express*'s. As its first step, the district court
required the student-athletes to show that "the challenged
restraints produce significant anticompetitive effects in the
relevant market." D. Ct. Op., at 1067. This was no slight
burden. According to one *amicus,* courts have disposed of
nearly all rule of reason cases in the last 45 years on the
ground that the plaintiff failed to show a substantial anti-
competitive effect. Brief for 65 Professors of Law, Business,
Economics, and Sports Management as *Amici Curiae* 21,
n. 9 ("Since 1977, courts decided 90% (809 of 897) on this
ground"). This suit proved different. As we have seen,

based on a voluminous record, the district court held that the student-athletes had shown the NCAA enjoys the power to set wages in the market for student-athletes' labor—and that the NCAA has exercised that power in ways that have produced significant anticompetitive effects. See D. Ct. Op., at 1067. Perhaps even more notably, the NCAA "did not meaningfully dispute" this conclusion. *Ibid.*

Unlike so many cases, then, the district court proceeded to the second step, asking whether the NCAA could muster a procompetitive rationale for its restraints. *Id.*, at 1070. This is where the NCAA claims error first crept in. On its account, the district court examined the challenged rules at different levels of generality. At the first step of its inquiry, the court asked whether the NCAA's entire package of compensation restrictions has substantial anticompetitive effects *collectively*. Yet, at the second step, the NCAA says the district court required it to show that each of its distinct rules limiting student-athlete compensation has procompetitive benefits *individually*. The NCAA says this mismatch had the result of effectively—and erroneously—requiring it to prove that each rule is the least restrictive means of achieving the procompetitive purpose of differentiating college sports and preserving demand for them.

We agree with the NCAA's premise that antitrust law does not require businesses to use anything like the least restrictive means of achieving legitimate business purposes. To the contrary, courts should not second-guess "degrees of reasonable necessity" so that "the lawfulness of conduct turn[s] upon judgments of degrees of efficiency." *Rothery Storage*, 792 F. 2d, at 227; *Continental T. V., Inc.* v. *GTE Sylvania Inc.*, 433 U. S. 36, 58, n. 29 (1977). That would be a recipe for disaster, for a "skilled lawyer" will "have little difficulty imagining possible less restrictive alternatives to most joint arrangements." 11 Areeda & Hovenkamp ¶1913b, p. 398 (2018). And judicial acceptance

of such imaginings would risk interfering "with the legitimate objectives at issue" without "adding that much to competition." 7 *id.*, ¶1505b, at 435–436.

Even worse, "[r]ules that seek to embody every economic complexity and qualification may well, through the vagaries of administration, prove counter-productive, undercutting the very economic ends they seek to serve." *Barry Wright Corp.* v. *ITT Grinnell Corp.*, 724 F. 2d 227, 234 (CA1 1983) (BREYER, J.). After all, even "[u]nder the best of circumstances," applying the antitrust laws "'can be difficult'"—and mistaken condemnations of legitimate business arrangements "'are especially costly, because they chill the very'" procompetitive conduct "'the antitrust laws are designed to protect.'" *Verizon Communications Inc.* v. *Law Offices of Curtis V. Trinko, LLP*, 540 U. S. 398, 414 (2004). Indeed, static judicial decrees in ever-evolving markets may themselves facilitate collusion or frustrate entry and competition. *Ibid.* To know that the Sherman Act prohibits only *unreasonable* restraints of trade is thus to know that attempts to "'[m]ete[r]' small deviations is not an appropriate antitrust function." Hovenkamp, Antitrust Balancing, 12 N. Y. U. J. L. & Bus. 369, 377 (2016).

While we agree with the NCAA's legal premise, we cannot say the same for its factual one. Yes, at the first step of its inquiry, the district court held that the student-athletes had met their burden of showing the NCAA's restraints collectively bear an anticompetitive effect. And, given that, yes, at step two the NCAA had to show only that those same rules collectively yield a procompetitive benefit. The trouble for the NCAA, though, is not the level of generality. It is the fact that the district court found unpersuasive much of its proffered evidence. See D. Ct. Op., at 1070–1076, 1080–1083. Recall that the court found the NCAA failed "to establish that the challenged compensation rules . . . have any direct connection to consumer demand." *Id.,* at 1070.

To be sure, there is a wrinkle here. While finding the

NCAA had failed to establish that its rules collectively sustain consumer demand, the court did find that "some" of those rules "may" have procompetitive effects "to the extent" they prohibit compensation "unrelated to education, akin to salaries seen in professional sports leagues." *Id.,* at 1082–1083. The court then proceeded to what corresponds to the third step of the *American Express* framework, where it required the student-athletes "to show that there are substantially less restrictive alternative rules that would achieve the same procompetitive effect as the challenged set of rules." D. Ct. Op., at 1104. And there, of course, the district court held that the student-athletes partially succeeded—they were able to show that the NCAA could achieve the procompetitive benefits it had established with substantially less restrictive restraints on education-related benefits.

Even acknowledging this wrinkle, we see nothing about the district court's analysis that offends the legal principles the NCAA invokes. The court's judgment ultimately turned on the key question at the third step: whether the student-athletes could prove that "substantially less restrictive alternative rules" existed to achieve the same procompetitive benefits the NCAA had proven at the second step. *Ibid.* Of course, deficiencies in the NCAA's proof of procompetitive benefits at the second step influenced the analysis at the third. But that is only because, however framed and at whichever step, anticompetitive restraints of trade may wind up flunking the rule of reason to the extent the evidence shows that substantially less restrictive means exist to achieve any proven procompetitive benefits. See, *e.g.,* 7 Areeda & Hovenkamp ¶1505, p. 428 ("To be sure, these two questions can be collapsed into one," since a "legitimate objective that is not promoted by the challenged restraint can be equally served by simply abandoning the restraint, which is surely a less restrictive alternative").

Simply put, the district court nowhere—expressly or effectively—required the NCAA to show that its rules constituted the *least* restrictive means of preserving consumer demand. Rather, it was only after finding the NCAA's restraints "'patently and inexplicably stricter than is necessary'" to achieve the procompetitive benefits the league had demonstrated that the district court proceeded to declare a violation of the Sherman Act. D. Ct. Op., at 1104. That demanding standard hardly presages a future filled with judicial micromanagement of legitimate business decisions.

B

In a related critique, the NCAA contends the district court "impermissibly redefined" its "product" by rejecting its views about what amateurism requires and replacing them with its preferred conception. Brief for Petitioner in No. 20–512, at 35–36.

This argument, however, misapprehends the way a defendant's procompetitive business justification relates to the antitrust laws. Firms deserve substantial latitude to fashion agreements that serve legitimate business interests—agreements that may include efforts aimed at introducing a new product into the marketplace. *Supra*, at 15–19. But none of that means a party can relabel a restraint as a product feature and declare it "immune from §1 scrutiny." *American Needle*, 560 U. S., at 199, n. 7. In this suit, as in any, the district court had to determine whether the defendants' agreements harmed competition and whether any procompetitive benefits associated with their restraints could be achieved by "substantially less restrictive alternative" means. D. Ct. Op., at 1104.

The NCAA's argument not only misapprehends the inquiry, it would require us to overturn the district court's factual findings. While the NCAA asks us to defer to its conception of amateurism, the district court found that the

NCAA had not adopted any consistent definition. *Id.,* at 1070. Instead, the court found, the NCAA's rules and restrictions on compensation have shifted markedly over time. *Id.,* at 1071–1074. The court found, too, that the NCAA adopted these restrictions without any reference to "considerations of consumer demand," *id.*, at 1100, and that some were "not necessary to preserve consumer demand," *id.*, at 1075, 1080, 1104. None of this is product redesign; it is a straightforward application of the rule of reason.

C

Finally, the NCAA attacks as "indefensible" the lower courts' holding that substantially less restrictive alternatives exist capable of delivering the same procompetitive benefits as its current rules. Brief for Petitioner in No. 20–512, at 46. The NCAA claims, too, that the district court's injunction threatens to "micromanage" its business. *Id.*, at 50.

Once more, we broadly agree with the legal principles the NCAA invokes. As we have discussed, antitrust courts must give wide berth to business judgments before finding liability. See *supra*, at 15–19. Similar considerations apply when it comes to the remedy. Judges must be sensitive to the possibility that the "continuing supervision of a highly detailed decree" could wind up impairing rather than enhancing competition. *Trinko*, 540 U. S., at 415. Costs associated with ensuring compliance with judicial decrees may exceed efficiencies gained; the decrees themselves may unintentionally suppress procompetitive innovation and even facilitate collusion. See *supra*, at 26–27. Judges must be wary, too, of the temptation to specify "the proper price, quantity, and other terms of dealing"—cognizant that they are neither economic nor industry experts. *Trinko*, 540 U. S., at 408. Judges must be open to reconsideration and modification of decrees in light of changing market reali-

ties, for "what we see may vary over time." *California Dental*, 526 U. S., at 781. And throughout courts must have a healthy respect for the practical limits of judicial administration: "An antitrust court is unlikely to be an effective day-to-day enforcer" of a detailed decree, able to keep pace with changing market dynamics alongside a busy docket. *Trinko*, 540 U. S., at 415. Nor should any court "'impose a duty . . . that it cannot explain or adequately and reasonably supervise.'" *Ibid.* In short, judges make for poor "central planners" and should never aspire to the role. *Id.*, at 408.

Once again, though, we think the district court honored these principles. The court enjoined only restraints on education-related benefits—such as those limiting scholarships for graduate school, payments for tutoring, and the like. The court did so, moreover, only after finding that relaxing these restrictions would not blur the distinction between college and professional sports and thus impair demand—and only after finding that this course represented a significantly (not marginally) less restrictive means of achieving the same procompetitive benefits as the NCAA's current rules. D. Ct. Op., at 1104–1105.

Even with respect to education-related benefits, the district court extended the NCAA considerable leeway. As we have seen, the court provided that the NCAA could develop its own definition of benefits that relate to education and seek modification of the court's injunction to reflect that definition. App. to Pet. for Cert. in No. 20–512, at 168a, ¶4. The court explained that the NCAA and its members could agree on rules regulating how conferences and schools go about providing these education-related benefits. *Ibid.* The court said that the NCAA and its members could continue fixing education-related cash awards, too—so long as those "limits are never lower than the limit" on awards for athletic performance. D. Ct. Op., at 1104; App. to Pet. for Cert. in No. 20–512, at 168a–169a, ¶5. And the court emphasized

that its injunction applies only to the NCAA and multicon-ference agreements; individual conferences remain free to reimpose every single enjoined restraint tomorrow—or more restrictive ones still. *Id.,* at 169a–170a, ¶¶6–7.

In the end, it turns out that the NCAA's complaints really boil down to three principal objections.

First, the NCAA worries about the district court's inclu-sion of paid posteligibility internships among the educa-tion-related benefits it approved. The NCAA fears that schools will use internships as a way of circumventing lim-its on payments that student-athletes may receive for ath-letic performance. The NCAA even imagines that boosters might promise posteligibility internships "at a sneaker company or auto dealership" with extravagant salaries as a "thinly disguised vehicle" for paying professional-level sal-aries. Brief for Petitioner in No. 20–512, at 37–38.

This argument rests on an overly broad reading of the in-junction. The district court enjoined only restrictions on education-related compensation or benefits "that may be made available *from conferences or schools.*" App. to Pet. for Cert. in No. 20–512, at 167a, ¶1 (emphasis added). Ac-cordingly, as the student-athletes concede, the injunction "does not stop the NCAA from continuing to prohibit com-pensation from" sneaker companies, auto dealerships, boosters, "or anyone else." Brief for Respondents 47–48; see also Brief for United States as *Amicus Curiae* 33. The NCAA itself seems to understand this much. Following the district court's injunction, the organization adopted new regulations specifying that only "a conference or institu-tion" may fund post-eligibility internships. See Decl. of M. Boyer in No. 4:14–md–02541, ECF Doc. 1302–2, p. 6 (ND Cal., Sept. 22, 2020) (NCAA Bylaw 16.3.4(d)).

Even when it comes to internships offered by conferences and schools, the district court left the NCAA considerable flexibility. The court refused to enjoin NCAA rules prohib-iting its members from providing compensation or benefits

unrelated to legitimate educational activities—thus leaving the league room to police phony internships. As we've observed, the district court also allowed the NCAA to propose (and enforce) rules defining what benefits do and do not relate to education. App. to Pet. for Cert. in No. 20–512, at 168a, ¶4. Accordingly, the NCAA may seek whatever limits on paid internships it thinks appropriate. And, again, the court stressed that individual conferences may restrict internships however they wish. *Id.,* at 169a, ¶6. All these features underscore the modesty of the current decree.

Second, the NCAA attacks the district court's ruling that it may fix the aggregate limit on awards schools may give for "academic or graduation" achievement no lower than its aggregate limit on parallel athletic awards (currently $5,980 per year). *Id.,* at 168a–169a, ¶5; D. Ct. Op., at 1104. This, the NCAA asserts, "is the very definition of a professional salary." Brief for Petitioner in No. 20–512, at 48. The NCAA also represents that "[m]ost" of its currently permissible athletic awards are "for genuine individual or team *achievement*" and that "[m]ost . . . are received by only a few student-athletes each year." *Ibid.* Meanwhile, the NCAA says, the district court's decree would allow a school to pay players thousands of dollars each year for minimal achievements like maintaining a passing GPA. *Ibid.*

The basis for this critique is unclear. The NCAA does not believe that the athletic awards it presently allows are tantamount to a professional salary. And this portion of the injunction sprang directly from the district court's finding that the cap on athletic participation awards "is an amount that has been shown not to decrease consumer demand." D. Ct. Op., at 1088. Indeed, there was no evidence before the district court suggesting that corresponding academic awards would impair consumer interest in any way. Again, too, the district court's injunction affords the NCAA leeway. It leaves the NCAA free to reduce its athletic awards. And it does not ordain what criteria schools must use for their

academic and graduation awards. So, once more, if the NCAA believes certain criteria are needed to ensure that academic awards are legitimately related to education, it is presently free to propose such rules—and individual conferences may adopt even stricter ones.

Third, the NCAA contends that allowing schools to provide in-kind educational benefits will pose a problem. This relief focuses on allowing schools to offer scholarships for "graduate degrees" or "vocational school" and to pay for things like "computers" and "tutoring." App. to Pet. for Cert. in No. 20–512, at 167a–168a, ¶2. But the NCAA fears schools might exploit this authority to give student-athletes "'luxury cars'" "to get to class" and "other unnecessary or inordinately valuable items" only "nominally" related to education. Brief for Petitioner in No. 20–512, at 48–49.

Again, however, this over-reads the injunction in ways we have seen and need not belabor. Under the current decree, the NCAA is free to forbid in-kind benefits unrelated to a student's actual education; nothing stops it from enforcing a "no Lamborghini" rule. And, again, the district court invited the NCAA to specify and later enforce rules delineating which benefits it considers legitimately related to education. To the extent the NCAA believes meaningful ambiguity really exists about the scope of its authority—regarding internships, academic awards, in-kind benefits, or anything else—it has been free to seek clarification from the district court since the court issued its injunction three years ago. The NCAA remains free to do so today. To date, the NCAA has sought clarification only once—about the precise amount at which it can cap academic awards—and the question was quickly resolved. Before conjuring hypothetical concerns in this Court, we believe it best for the NCAA to present any practically important question it has in district court first.

When it comes to fashioning an antitrust remedy, we acknowledge that caution is key. Judges must resist the

temptation to require that enterprises employ the least re-
strictive means of achieving their legitimate business objec-
tives. Judges must be mindful, too, of their limitations—as
generalists, as lawyers, and as outsiders trying to under-
stand intricate business relationships. Judges must re-
main aware that markets are often more effective than the
heavy hand of judicial power when it comes to enhancing
consumer welfare. And judges must be open to clarifying
and reconsidering their decrees in light of changing market
realities. Courts reviewing complex business arrange-
ments should, in other words, be wary about invitations to
"set sail on a sea of doubt." *United States* v. *Addyston Pipe
& Steel Co.*, 85 F. 271, 284 (CA6 1898) (Taft, J.). But we do
not believe the district court fell prey to that temptation.
Its judgment does not float on a sea of doubt but stands on
firm ground—an exhaustive factual record, a thoughtful le-
gal analysis consistent with established antitrust princi-
ples, and a healthy dose of judicial humility.

*

Some will think the district court did not go far enough.
By permitting colleges and universities to offer enhanced
education-related benefits, its decision may encourage
scholastic achievement and allow student-athletes a meas-
ure of compensation more consistent with the value they
bring to their schools. Still, some will see this as a poor
substitute for fuller relief. At the same time, others will
think the district court went too far by undervaluing the
social benefits associated with amateur athletics. For our
part, though, we can only agree with the Ninth Circuit:
"'The national debate about amateurism in college sports is
important. But our task as appellate judges is not to resolve
it. Nor could we. Our task is simply to review the district
court judgment through the appropriate lens of antitrust
law.'" 958 F. 3d, at 1265. That review persuades us the
district court acted within the law's bounds.

The judgment is

*Affirmed.*

# SUPREME COURT OF THE UNITED STATES

---

Nos. 20–512 and 20–520

---

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,
PETITIONER
20–512                           *v.*
SHAWNE ALSTON, ET AL.


AMERICAN ATHLETIC CONFERENCE, ET AL.,
PETITIONERS
20–520                           *v.*
SHAWNE ALSTON, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 21, 2021]

JUSTICE KAVANAUGH, concurring.

The NCAA has long restricted the compensation and benefits that student athletes may receive. And with surprising success, the NCAA has long shielded its compensation rules from ordinary antitrust scrutiny. Today, however, the Court holds that the NCAA has violated the antitrust laws. The Court's decision marks an important and overdue course correction, and I join the Court's excellent opinion in full.

But this case involves only a narrow subset of the NCAA's compensation rules—namely, the rules restricting the *education-related* benefits that student athletes may receive, such as post-eligibility scholarships at graduate or vocational schools. The rest of the NCAA's compensation rules are not at issue here and therefore remain on the books. Those remaining compensation rules generally re-

strict student athletes from receiving compensation or benefits from their colleges for playing sports. And those rules have also historically restricted student athletes from receiving money from endorsement deals and the like.

I add this concurring opinion to underscore that the NCAA's remaining compensation rules also raise serious questions under the antitrust laws. Three points warrant emphasis.

*First*, the Court does not address the legality of the NCAA's remaining compensation rules. As the Court says, "the student-athletes do not renew their across-the-board challenge to the NCAA's compensation restrictions. Accordingly, we do not pass on the rules that remain in place or the district court's judgment upholding them. Our review is confined to those restrictions now enjoined." *Ante,* at 14.

*Second*, although the Court does not weigh in on the ultimate legality of the NCAA's remaining compensation rules, the Court's decision establishes how any such rules should be analyzed going forward. After today's decision, the NCAA's remaining compensation rules should receive ordinary "rule of reason" scrutiny under the antitrust laws. The Court makes clear that the decades-old "stray comments" about college sports and amateurism made in *National Collegiate Athletic Assn.* v. *Board of Regents of Univ. of Okla.*, 468 U. S. 85 (1984), were dicta and have no bearing on whether the NCAA's current compensation rules are lawful. *Ante,* at 21. And the Court stresses that the NCAA is not otherwise entitled to an exemption from the antitrust laws. *Ante,* at 23–24; see also *Radovich* v. *National Football League*, 352 U. S. 445, 449–452 (1957). As a result, absent legislation or a negotiated agreement between the NCAA and the student athletes, the NCAA's remaining compensation rules should be subject to ordinary rule of reason scrutiny. See *ante,* at 18–19.

*Third*, there are serious questions whether the NCAA's

remaining compensation rules can pass muster under ordinary rule of reason scrutiny. Under the rule of reason, the NCAA must supply a legally valid procompetitive justification for its remaining compensation rules. As I see it, however, the NCAA may lack such a justification.

The NCAA acknowledges that it controls the market for college athletes. The NCAA concedes that its compensation rules set the price of student athlete labor at a below-market rate. And the NCAA recognizes that student athletes currently have no meaningful ability to negotiate with the NCAA over the compensation rules.

The NCAA nonetheless asserts that its compensation rules are procompetitive because those rules help define the product of college sports. Specifically, the NCAA says that colleges may decline to pay student athletes because the defining feature of college sports, according to the NCAA, is that the student athletes are not paid.

In my view, that argument is circular and unpersuasive. The NCAA couches its arguments for not paying student athletes in innocuous labels. But the labels cannot disguise the reality: The NCAA's business model would be flatly illegal in almost any other industry in America. All of the restaurants in a region cannot come together to cut cooks' wages on the theory that "customers prefer" to eat food from low-paid cooks. Law firms cannot conspire to cabin lawyers' salaries in the name of providing legal services out of a "love of the law." Hospitals cannot agree to cap nurses' income in order to create a "purer" form of helping the sick. News organizations cannot join forces to curtail pay to reporters to preserve a "tradition" of public-minded journalism. Movie studios cannot collude to slash benefits to camera crews to kindle a "spirit of amateurism" in Hollywood.

Price-fixing labor is price-fixing labor. And price-fixing labor is ordinarily a textbook antitrust problem because it extinguishes the free market in which individuals can otherwise obtain fair compensation for their work. See, *e.g.,*

*Texaco Inc.* v. *Dagher*, 547 U. S. 1, 5 (2006).  Businesses like the NCAA cannot avoid the consequences of price-fixing labor by incorporating price-fixed labor into the definition of the product.  Or to put it in more doctrinal terms, a monopsony cannot launder its price-fixing of labor by calling it product definition.

The bottom line is that the NCAA and its member colleges are suppressing the pay of student athletes who collectively generate *billions* of dollars in revenues for colleges every year.  Those enormous sums of money flow to seemingly everyone except the student athletes.  College presidents, athletic directors, coaches, conference commissioners, and NCAA executives take in six- and seven-figure salaries.  Colleges build lavish new facilities.  But the student athletes who generate the revenues, many of whom are African American and from lower-income backgrounds, end up with little or nothing.  See Brief for African American Antitrust Lawyers as *Amici Curiae* 13–17.

Everyone agrees that the NCAA can require student athletes to be enrolled students in good standing.  But the NCAA's business model of using unpaid student athletes to generate billions of dollars in revenue for the colleges raises serious questions under the antitrust laws.  In particular, it is highly questionable whether the NCAA and its member colleges can justify not paying student athletes a fair share of the revenues on the circular theory that the defining characteristic of college sports is that the colleges do not pay student athletes.  And if that asserted justification is unavailing, it is not clear how the NCAA can legally defend its remaining compensation rules.

If it turns out that some or all of the NCAA's remaining compensation rules violate the antitrust laws, some difficult policy and practical questions would undoubtedly ensue.  Among them: How would paying greater compensation to student athletes affect non-revenue-raising sports?  Could student athletes in some sports but not others receive

compensation? How would any compensation regime comply with Title IX? If paying student athletes requires something like a salary cap in some sports in order to preserve competitive balance, how would that cap be administered? And given that there are now about 180,000 Division I student athletes, what is a financially sustainable way of fairly compensating some or all of those student athletes?

Of course, those difficult questions could be resolved in ways other than litigation. Legislation would be one option. Or colleges and student athletes could potentially engage in collective bargaining (or seek some other negotiated agreement) to provide student athletes a fairer share of the revenues that they generate for their colleges, akin to how professional football and basketball players have negotiated for a share of league revenues. Cf. *Brown* v. *Pro Football, Inc.*, 518 U. S. 231, 235–237 (1996); *Wood* v. *National Basketball Assn.*, 809 F. 2d 954, 958–963 (CA2 1987) (R. Winter, J.). Regardless of how those issues ultimately would be resolved, however, the NCAA's current compensation regime raises serious questions under the antitrust laws.

To be sure, the NCAA and its member colleges maintain important traditions that have become part of the fabric of America—game days in Tuscaloosa and South Bend; the packed gyms in Storrs and Durham; the women's and men's lacrosse championships on Memorial Day weekend; track and field meets in Eugene; the spring softball and baseball World Series in Oklahoma City and Omaha; the list goes on. But those traditions alone cannot justify the NCAA's decision to build a massive money-raising enterprise on the backs of student athletes who are not fairly compensated. Nowhere else in America can businesses get away with agreeing not to pay their workers a fair market rate on the theory that their product is defined by not paying their workers a fair market rate. And under ordinary principles of antitrust law, it is not evident why college sports should be any different. The NCAA is not above the law.